## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

DERRICK ELLIS GARDNER,     )
                     )
     Plaintiff,          )
                     )
vs.                    )     7:16-cv-01304-LSC
                     )
CITY OF NORTHPORT,     )
     Defendant.       )
                     )

### MEMORANDUM OF OPINION

Before this Court is Defendant's Motion for Summary Judgment. (Doc. 33.) Plaintiff Derrick Ellis Gardner sued Defendant City of Northport for disability discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* and under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*; and for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Defendant has moved for summary judgment on all of Plaintiff's claims. (Doc. 25.)[1] The issues raised in Defendant's Motion for Summary Judgment have been briefed by both parties and are now ripe for review. Upon full consideration of the legal arguments and evidence presented,

---

[1] Defendant had previously filed a Motion to Dismiss Complaint, or in the Alternative, for Summary Judgment, (doc. 20), which argues that Plaintiff's Complaint is due to be dismissed on the basis of judicial estoppel. Because the Court finds Defendant's Motion for Summary Judgment is due to be granted, it does not reach whether Plaintiff's Complaint should be dismissed on this alternate ground.

Defendant's Motion for Summary Judgment will be granted and this action dismissed.

## I. FACTS

Plaintiff was a police officer at the City of Northport Police Department, and began his employment there in 1999. By all accounts Plaintiff was an excellent police officer who performed his job admirably and got along with his coworkers. However, Plaintiff suffered a number of health problems that affected his ability to perform his police officer duties. Most important to this action, Plaintiff has suffered from type two diabetes since 1995.

Due to complications from his diabetes, Plaintiff suffered a hemorrhage in his right eye on April 18, 2014. Plaintiff went to see his retinal specialist Dr. Matthew Oltmanns ("Dr. Oltmanns") on April 21, 2014. Dr. Oltmanns noted during the visit that Plaintiff should not drive or go to work in his current state, and that Plaintiff should return a week later to see if his condition improved. Apparently, Plaintiff's condition did not improve within the next week, as Dr. Oltmanns performed two surgeries on Plaintiff's right eye on April 30 and June 18, 2014. Following the June 18th surgery, Dr. Oltmanns indicated that Plaintiff should not perform heavy lifting, bending, or straining and that Plaintiff should not return to work "at this time."

During the initial period of Plaintiff's illness, he used accumulated paid leave to cover his absences. This individual paid leave lasted approximately a month. Defendant's leave policy also allowed for so-called "donated leave," where employees that had accumulated unused paid leave could "donate" that unused leave voluntarily to another employee. Certain coworkers donated approximately five (5) weeks under Defendant's policy, allowing Plaintiff to remain on paid leave until mid-June 2014.

In May 2014, Plaintiff also submitted an application for FMLA leave. The Defendant chose to construe Plaintiff's twelve-week FMLA leave period as beginning to run only after his paid leave had expired. Thus, according to Defendant, the FMLA unpaid-leave period began to run June 18, 2014 until it expired on September 11, 2014. On September 4, 2014, Dr. Oltmanns noted that Plaintiff's right eye "will be a challenge—could be multiple surgery process. . . . This will be a long process." (Doc. 33 ¶ 31.) Plaintiff was not cleared to return to work on September 11, 2014.

Because Plaintiff was not allowed to return to work at the expiration of his FMLA leave on September 11, 2014, then City Administrator Scott Collins ("Collins") instructed HR Director Joseph Rose ("Rose") to grant Plaintiff

additional time off to recover. Plaintiff had another appointment with Dr. Oltmanns on September 18, 2014.

On September 18, 2014, Plaintiff sent Rose an email stating that Plaintiff was not yet cleared to return to work, and would need another surgery on his eye for October 15, 2014 and "at least 3-4 weeks" to recover. (*Id.* ¶ 34.) In response, Rose informed Collins of this additional request for leave. Collins asked Rose to contact Plaintiff and to meet in person to discuss how much time Plaintiff would need to return to work. Collins[2] and Rose met with Plaintiff and his wife on September 24, 2014, where Plaintiff told Collins and Rose that he was having trouble contacting Dr. Oltmanns' office for a clear answer, but that he had an appointment with Dr. Oltmanns the following day on September 25, 2014. Collins approved another extension for Plaintiff until October 6, 2014 to get his needed medical documentation releasing him to work.

Plaintiff received a "return-to-work" note from Dr. Oltmanns on September 25, 2014, and Plaintiff gave that note to Rose on the same day. The note stated in full:

> Our patient, Derrick Gardner, is released back to work with no physical restrictions until October 15, 2014. His visual acuities are 20/50 RIGHT eye, and HAND MOTION in the LEFT eye.

---

[2] Plaintiff disputes that Collins was at this meeting; whether Collins was present at that meeting ultimately has no bearing on Plaintiff's discrimination claim.

(*Id.* ¶ 38.) Upon receipt of the letter, Rose was unsure of the meaning of "HAND MOTION" on the note. He decided to send the note to Dr. Peter Casten ("Dr. Casten"), an occupational medical specialist at DCH Hospital, to schedule a fitness-for-duty test for Plaintiff.

Dr. Casten reviewed the note sent to him by Rose, and called Dr. Oltmanns to directly speak to him about the vision requirements for a police officer and Plaintiff's vision. During that talk, the two doctors agreed that Plaintiff's current vision did not meet the Defendant's requirements to be a police officer. In his chart notes for September 25, 2014, Dr. Oltmanns wrote:

> Spoke with Dr. Casten at DCH (Occ. Health), based on patient's current VA's [visual acuities], he will not recommend patient continue normal work as police officer. I agree with this assessment. Patient should not be active duty police at this time.

(*Id.* ¶ 42 (underline in original).) Dr. Casten subsequently sent Rose a letter stating "[Plaintiff] does not meet visual requirements for a police officer until further notice." (*Id.* ¶ 40.) In addition to the note, Dr. Casten's office called Rose to inform him there was no need to schedule a fitness-for-duty test for Plaintiff.

Dr. Oltmanns then met with Plaintiff on October 9, 2014 for a follow-up appointment. Dr. Oltmanns' note from that appointment stated that he "anticipat[ed] multiple surgeries for [Plaintiff's] left eye with silicone oil" and that he would have "significant postoperative hemorrhage that will need to be dealt

with." (Doc. 34-1 Ex. A Def. Ex. 17.) It was Dr. Oltmanns' opinion that even after multiple surgeries it would be unclear whether Plaintiff's vision would improve. (Doc. 34-1 Ex. A Def. Ex. 17.)

Because of the medical opinions provided by Dr. Casten and Oltmanns that Plaintiff was unable to return to work within a finite period, Collins determined to terminate Plaintiff's employment. Plaintiff and his wife met with Collins, Rose, and Chief of Police Burton on October 10, 2014. In that meeting, Collins told Plaintiff that he would not be able to work for Defendant any more. Collins also gave Plaintiff a letter outlining what Collins believed to be the accommodations previously given to Plaintiff, including not running the twelve-week FMLA period concurrently with Plaintiff's paid leave and the extra time given to Plaintiff after the expiration of the statutorily mandated FMLA period. Collins explained that Defendant was terminating Plaintiff's employment because Plaintiff had been unable to work for over five months and would need at least two more months for additional surgeries to his right eye. Collins additionally stated that at the conclusion of those surgeries it was not certain that Plaintiff's vision would even have improved to the point where it needed to be. After giving Plaintiff these reasons, Collins asked Plaintiff if he had any questions. Plaintiff said that he did not.

While Plaintiff had the right to appeal his termination to the Northport Civil Service Board, there is no record of an appeal. On December 8, 2014, Plaintiff filed an EEOC charge alleging violations of Title VII and the ADA. Following its investigation, on September 19, 2015, the EEOC found cause to believe that Defendant violated Plaintiff's rights under the ADA. The parties attempted conciliation on October 20, 2015, but were unable to resolve their differences. On May 24, 2016, the EEOC issued Plaintiff the right to sue notice. Plaintiff filed his Complaint in this action on August 10, 2016.

## II. Standard

A motion for summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge

should not weigh the evidence but must simply determine whether there are any genuine issues to be resolved at trial. *Anderson,* 447 U.S. at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). "[T]he moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "summary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III. Discussion

Plaintiff claims that Defendant violated the ADA, Rehabilitation Act, and Title VII when it terminated him from his position rather than giving him a light-work accommodation. The Eleventh Circuit applies "the burden-shifting analysis of Title VII employment discrimination claims" to ADA discrimination claims as well as Rehabilitation Act claims. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (ADA claims); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) (*McDonnell Douglas* framework applies to ADA disability discrimination claims); *Sutton v. Lader*, 185 F.3d 1203, 1208 n.5 (11th Cir. 1999). Under *McDonnell Douglas*, the plaintiff carries the initial burden of producing circumstantial evidence sufficient to prove a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999). If the plaintiff meets his initial burden of establishing a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016), *cert. denied sub nom. Trask v. Shulkin*, 137 S. Ct. 1133, 197 L. Ed. 2d 176 (2017). If the defendant is successful,

"the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).

### 1. PRIMA FACIE CASE OF DISABILITY DISCRIMINATION UNDER THE ADA AND REHABILITATION ACT

"In order to establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)); *Sutton*, 185 F.3d at 1207 (To establish a prima facie case under the Rehabilitation Act, the Plaintiff must show that he has a disability, is otherwise qualified, and was subjected to unlawful discrimination as the result of his disability.). "This standard derives from the ADA's language, stating that 'no [employer] shall discriminate against a qualified individual with a disability because of the disability of such an individual.'" *Greenberg*, 231 F.3d at 1305 (quoting 42 U.S.C. § 12112(a)). While Defendant does not address whether Plaintiff is "disabled", it contends that Plaintiff cannot satisfy his burden to show that he is a "qualified individual" under the ADA.

In order to be a qualified individual under the ADA or Rehabilitation Act, Plaintiff must be able to show that he could perform the functions of his job with or

without reasonable accommodation. *Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *see also D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005) (An ADA plaintiff "must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation."(quoting *Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000))). "An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). If the individual "is unable to perform an essential function of his . . . job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA. In other words, the ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job." *D'Angelo*, 422 F.3d at 1229 (quoting *Davis*, 205 F.3d at 1305).

It is clear from the undisputed facts of this case that Plaintiff was unable to perform the essential functions of being a police officer without an accommodation. Under 29 C.F.R. § 1630.2(n)[3], the essential functions of a job include "the fundamental job duties of the employment position the individual with a disability

---

[3] Congress provided the EEOC authority to issue implementing regulations, including § 1630.2(n), to carry out the ADA. 42 U.S.C. § 12116.

holds or desires," without paying attention to the marginal functions of the position. Evidence of whether a particular job function is essential includes, but is not limited to factors such as:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> . . .

29 C.F.R. § 1630.2(n)(3)(i-iv).

It is undisputed that to be a police officer employed by Defendant, Plaintiff had to take and pass a firearms and driving test annually. Likewise, in the written job descriptions for police officers provided to Northport police officers, the job description sets out a requirement for physical characteristics such as:

> See well enough to operate a firearm safely and accurately.
>
> See well enough to read small print on driver's licenses.
>
> Effectively operate a motor vehicle, firearm, radio, and other police equipment.
>
> Have the ability to move quickly in emergency situations.
>
> Physical abilities to exercise self-defense techniques.

(Doc. 34-1 Ex. A Def. Ex. 17.) Defendant's job requirements place a heavy emphasis on the ability to see well enough to use a firearm and operate a vehicle. There does not appear to be a dispute between the parties that the ability to use a firearm and operate a police vehicle in emergency defensive maneuvers constitutes an essential function of being a police officer. (*See* Doc. 34-1 Gardner Depo. at 124-125 ("Q: . . . difficulty in use of firearm, reading small print, possibly reacting to self-defense situations; no heavy lifting, bending or straining. . . . Are each of those functions essential job functions [of a law enforcement officer for the City of Northport?] A: Yes.").

There is also no dispute that Dr. Casten was of the opinion that Plaintiff could not safely operate a firearm or vehicle with monocular vision and that from 2014 until the present Plaintiff had monocular vision in his left eye. (Doc. 37 at 11.) As Plaintiff points out, a September 25, 2014, note from Dr. Oltmanns to Rose stated that Plaintiff could return to work until October 15, 2014, but had "HAND MOTION" in the left eye. (Doc. 33 ¶ 38.) After Dr. Casten reviewed Dr. Oltmanns' note and consulted with Dr. Oltmanns, both doctors jointly concluded that Plaintiff could not meet the vision requirements to be a police officer. Although Dr. Oltmanns may have initially believed Plaintiff was able to return to work, he apparently determined that his earlier note was incorrect.

While Plaintiff partially argues that Dr. Oltmanns' earlier return-to-work note shows that he was able to perform the essential functions of being a police officer, Plaintiff also argues that "based on his own extensive observation and experience, . . . he could safely operate a firearm and a vehicle." (Doc. 37 at 11.) This self-assessment appears to be based on Plaintiff's ability "to read the newspaper." (*Id.*) Plaintiff's beliefs or allegations concerning his own performance and ability are not connected to any admissible evidence, but appear to simply be allegations recast as Plaintiff's own, lay opinion. Other than these allegations, "[Plaintiff] offers no expert opinion that counters Dr. Casten's opinion." (*Id.*)

In *Alexander v. Northland Inn*, 321 F.3d 723 (8th Cir. 2003), the Eighth Circuit rejected an ADA plaintiff's argument that she could perform an essential function of her job, vacuuming, despite her physician's written conclusion to the contrary. *Id.* at 727. *Alexander* held that:

> [Employer] was entitled to rely and act upon the written advice from [employee's] physician that unambiguously and permanently restricted her from vacuuming. In this situation, the employee's belief or opinion that she can do the function is simply irrelevant. The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden.

*Id.* Reading the newspaper and operating a firearm or vehicles are different actions completely, and even if Plaintiff's own beliefs about his abilities were relevant, his ability to read the newspaper does not equate to his ability to perform the essential

functions of his job. Nor does it matter that Plaintiff was terminated before being given the qualifications test for operation of a firearm or vehicle, as both Dr. Casten and Dr. Oltmann were of the opinion he could not safely perform those activities. Plaintiff cites no authority for the proposition that Defendant was required to give him qualifications tests in lieu of relying on the opinions of Dr. Casten and Oltmanns.

Plaintiff's belief of his own abilities concerning essential police duties are important to put in the context of the treatment for his chronic vision problems. Even if Plaintiff's own self-assessed ability to operate a firearm and vehicle actually reflected his condition in late September and early October, Plaintiff was unable to return to work after the final extension of his FMLA leave on October 6, 2014. (Doc. 33 at ¶ 37.) On October 9, 2014, Dr. Oltmanns met with Plaintiff, and his doctor's note stated that Dr. Oltmanns "anticipat[ed] multiple surgeries for [Plaintiff's] left eye" and that even with multiple surgeries it would be unclear whether Plaintiff's vision would be improved. (Doc. 34-1 Ex. A Def. Ex. 17.) Indeed, Plaintiff had another scheduled surgery on October 15, 2014, with 3-4 weeks recovery time and no assurance that even after recovery he would be able to return to work. (*Id.* ¶ 43.) Even if Plaintiff was able to perform the essential functions of a police officer on the date of his termination—which he was not—he

would have not been able to stay at work for more than five days, where he would again have to take an indefinite leave of absence for his surgery.

Plaintiff alternatively argues that he would be able to perform his duties as a police officer if he was given reasonable accommodation in the form of "light work." As this Court has stated previously:

> "[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999). Instead, the plaintiff must show that [he] actually demanded an accommodation of [his] disability from the employer and was refused. *Gaston,* 167 F.3d at 1363–64; *Branscomb v. Secretary of Navy,* 461 Fed. App'x 901, 905 (11th Cir. 2012); *Knowles v. Sheriff,* 460 Fed. App'x 833, 835–36 (11th Cir. 2012); *see also Schwarz v. City of Treasure Isl.,* 544 F.3d 1201, 1219 (11th Cir. 2008) ("The duty to make a reasonable accommodation does not simply spring from the fact that the [plaintiff] wants such an accommodation made." (quoting *Prindable v. Association of Apt. Owners,* 304 F.Supp.2d 1245, 1258 (D. Hawaii 2003)).

*Flowers v. City of Tuscaloosa*, No. 7:11-CV-01375-JEO, 2013 WL 625324, at *11 (N.D. Ala. Feb. 14, 2013). Plaintiff identifies multiple instances when Defendant provided "light work" accommodations to other employees at the Northport Police Department. However, the parties' undisputed facts show that Plaintiff never requested a reasonable accommodation, and because he did not do so Defendant was under no obligation under the ADA to provide such an accommodation.

Plaintiff argues that a conversation he had with Assistant Chief Burton constitutes a request for an accommodation under the ADA. According to Plaintiff:

> When Officer Gardner suffered his heart attack, then Assistant Chief Burton met him at his house and they discussed any request for "light duty." Officer Gardner understood this conversation to be that if he requested light duty and if then Chief Card granted him light duty, that Chief Card would be fired by then City Administrator Collins. Out of loyalty to Chief Card, Officer Gardner did not request light duty. Within a few months, Officer Gardner's vision issues arose and due to this previous incident, Officer Gardner did not request light duty in order to prevent problems with Chief Card.

(Doc. 37 at 16-17 (citations omitted).) Specifically, after Plaintiff suffered the hemorrhage in his left eye, he prepared a letter to submit to formally request an accommodation in the form of light duty. After consideration of the difficulty the request would create for his superior, Plaintiff did not submit the letter. (Doc. 34-1 at 88.)  The Court understands that Plaintiff was told by his superiors that the Chief of Police would be fired for requesting light duty, and that he was apparently put in the situation where he needed to choose either his personal interests or that of the Chief of Police. Plaintiff still was free to request an accommodation, despite the no-win situation that he felt he faced. Plaintiff's knowing choice to not request an accommodation shows his loyalty to his friend, but it likewise shows that he was not inhibited from requesting light duty. Because Plaintiff did not request an accommodation, Defendant was not required to provide him with one.

Even if Plaintiff had requested a "light work" accommodation, such as those given to other police officers in the past, Plaintiff's disability would have prevented him from performing the essential functions of being a police officer. Plaintiff has pointed to a number of male and female police officers who were given "light work" accommodations. Male officers Anthony Parker, Darrin Miller, Drew Wallace, and Scottie Dalton were all given light work accommodations such as working at the intake desk or records section of the police department. Each of these officers was still able to carry and operate their police firearm and drive a vehicle (Doc. 33 ¶ 61-62.) Likewise, female officers Carrie Summers, Ashley Hogg, and Vanessa Blaylock were given light work accommodations, but still could carry and operate their firearms and perform all other police duties. (*Id.* ¶ 68-70.) Even if Plaintiff was given a "light work" accommodation as he argues he should have been, there was no way he could have performed the essential functions of being a police officer when he could not safely operate a firearm or vehicle.

Plaintiff has failed to show that he was a "qualified individual" under the ADA because he could not perform the essential functions of being a police officer with or without accommodation, and has thus not made his *prima facie* case under the ADA or Rehabilitation Act. These claims are thus due to be dismissed.

## 2. PRIMA FACIE CASE OF RACE DISCRIMINATION

To establish a *prima facie* case of race discrimination under a single-motive, pretext theory, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job." *Trask*, 822 F.3d at 1192 (quoting *Burke–Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam)). Specifically with respect to Plaintiff's burden to show that he was qualified for the position from which he was terminated, "a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). Objective qualifications can be established by "evidence that is *objectively verifiable* and either easily obtainable or within the plaintiff's possession." *Id.* (emphasis in original). Examples of objective qualifications include education, years of experience, and state certification levels, where an example of subjective criteria would be whether a plaintiff lacks the employer's preferred leadership style for the position. *Id.* at 768-69.

As with Plaintiff's ADA claim, Plaintiff's Title VII race discrimination claim fails because at the time of the adverse action—Plaintiff's termination—he was not qualified to perform his duties as a police officer. The conclusions of Plaintiff's

physicians about Plaintiff's ability to operate a firearm and vehicle and Plaintiff's inability to return to work at the time of his firing are equally applicable to his Title VII claim.

Nor can Plaintiff identify any similarly situated comparators. "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted). If this is not the case, "the different application of workplace rules does not constitute illegal discrimination." *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 (11th Cir. 1984)). In order to be considered "similarly situated," the compared employees must have been "involved in or accused of the same or similar conduct," yet "disciplined [or treated] in different ways" for that conduct. *Holifield*, 115 F.3d at 1562 (citations omitted). The Eleventh Circuit utilizes a "nearly identical" standard to determine whether the conduct and respective treatment of two employees are sufficiently similar for establishing a *prima facie* case of discrimination. *Stone & Webster Const., Inc. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1134-35 (11th Cir. 2012) (holding that the Department of Labor's Administrative Review Board had incorrectly relied on a "similar misconduct"

standard which had been expressly set aside in favor of the "nearly identical" standard) (citing *Burke-Fowler*, 447 F.3d at 1323 n.2). The "nearly identical" standard does not require that the comparators are the "plaintiff's dopplegangers" but requires "much more than a showing of surface-level resemblance." *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 2510 (2016). The "quantity and quality of the comparator's misconduct [or circumstances] must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler*, 447 F.3d at 1323 (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Plaintiff, an African American male, has offered a number of comparators employed by Defendant. Those comparators include (1) Scottie Dalton, a Caucasian male, who was given a light work assignment for a non-work related injury, as well as (2) Summers, Hogg, and Blaylock[4], female officers who were given an accommodation in the form of light duty during their pregnancy. The Court initially notes that none of these comparators are similarly situated to Plaintiff, because Dalton, Summers, Hogg, and Blaylock, could all continue to use their firearms while on light duty. Given that the ability to operate a firearm is an

---

[4] Plaintiff has not indicated the race of Summers, Hogg, and Blaylock in his Response in Opposition to Summary Judgment. Thus, while these comparators would be sufficient for a claim of discrimination based on gender, Plaintiff's Title VII claim is for discrimination based on race. (*See* Doc. 1 at 12.) Even proceeding under the assumptions that these officers did not share Plaintiff's race, Plaintiff's Title VII claim is still due to be dismissed.

essential part of being a police officer, the Court cannot say that Plaintiff's situation is "nearly identical" to that of Dalton, Summers, Hogg, and Blaylock.

It does not matter that Dalton, Summers, Hogg, and Blaylock were given light work for non-work-related issues as opposed to work-related issues. While Dalton was given a light-work accommodation for a non-work-related injury, this appears to be an aberration from the Defendant's usual policy of only extending light work to employees injured on the job. When Collins found out that Dalton was given light work for a non-work-related injury, he ordered that Dalton be removed immediately from light work. That Summers, Hogg, and Blaylock were given light work during their pregnancies is also not "nearly identical" to Plaintiff, who was suffering complications from diabetes.

Because Plaintiff cannot show that he was qualified for his job as a police officer and cannot identify any comparators, he cannot make out a *prima facie* case of race discrimination. Plaintiff's Title VII race discrimination claim is thus due to be dismissed.

## IV. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (doc. 33) is due to be GRANTED. Defendant's Motion to Dismiss Complaint, or

in the Alternative, for Summary Judgment (doc. 20) is therefore MOOT. An Order consistent with this Opinion will be entered separately.

**DONE** AND **ORDERED** ON JUNE 7, 2018.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485